# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMON PEREZ ZAPATA, | Case No. 1:16-cv-01260-LJO-EPG-HC |
| Petitioner, | |
| | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| S. FRAUENHEIM, | |
| Respondent. | (ECF No. 21) |

Petitioner Ramon Perez Zapata is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the second amended petition, Petitioner raises the following claims for relief: (1) constructive denial of assistance of counsel; (2) unconstitutional restriction of cross-examination; (3) erroneous admission of Petitioner's coerced confession; (4) insufficient evidence to support guilty verdicts; and (5) ineffective assistance of counsel.

For the reasons discussed herein, the undersigned recommends denial of the second amended petition for writ of habeas corpus.

## I.

## BACKGROUND

On July 15, 2013, Petitioner was convicted by a jury in the Madera County Superior Court of: digital penetration of a child ten years or younger (count 1); attempted sexual

intercourse with a child ten years or younger (count 2); engaging in oral copulation with a child ten years or younger (count 3); committing a lewd and lascivious act upon a child under fourteen years (count 4). (CT[1] 155–161). Petitioner was sentenced to an aggregate term of nine years (counts 2, 4) plus two consecutive terms of fifteen years to life (counts 1, 3). (15 RT[2] 4209–10). On November 10, 2015, the California Court of Appeal, Fifth Appellate District remanded the matter to the trial court to correct clerical errors in the abstract of judgment, but otherwise affirmed the judgment. People v. Zapata, No. F068199, 2015 WL 6945730, at *5 (Cal. Ct. App. Nov. 10, 2015). Petitioner's petition for review, which only raised a Marsden claim, was denied by the California Supreme Court on January 13, 2016. (LDs[3] 4, 5).

On August 25, 2016, Petitioner commenced the instant proceedings by filing a federal habeas petition, which alleged that: (1) the trial court failed to undertake the requisite Marsden inquiry; (2) the trial court erroneously restricted cross-examination; and (3) Petitioner was convicted on the basis of an unlawful confession. (ECF No. 1). As claims 2 and 3 were unexhausted, the Court granted Petitioner's request to stay the proceedings pursuant to Kelly v. Small, 315 F.3d 1063 (9th Cir. 2002). (ECF No. 9). Thereafter, Petitioner filed the first amended petition that deleted the two unexhausted claims, and the Court stayed this matter on October 25, 2016. (ECF Nos. 11, 14).

Subsequently, Petitioner filed six state habeas petitions, which were all denied. (LDs 6–17). On October 11, 2017, the Court granted Petitioner leave to file the instant second amended petition and lifted the stay. (ECF Nos. 21, 23). Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 34, 38).

## II.

## STATEMENT OF FACTS

At trial, the victim testified that she lived in a house with: her father; her sister Carmen Cervantes; Petitioner, who was Ms. Cervantes's husband; and her nephew, the son of Ms.

---

[1] "CT" refers to the Clerk's Transcript on Appeal, consisting of 272 pages, lodged by Respondent on March 9, 2018. (ECF No. 36).
[2] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on March 9, 2018. (ECF No. 36).
[3] "LD" refers to the documents lodged by Respondent on March 9, 2018. (ECF No. 36).

Cervantes and Petitioner. (5 RT 1229–31). The victim testified that Petitioner began sexually abusing her when she was nine or ten years old. (5 RT 1231). The victim testified that Petitioner touched her breast and vagina, put his finger inside her vagina, attempted to have sexual intercourse with her, rubbed his penis against her thigh and vagina, licked her vagina, and put her hand on his penis. (5 RT 1232–46, 1251, 1257–59, 1286). These incidents occurred mainly at night while Ms. Cervantes slept, most often at the computer (which was in the kitchen next to Ms. Cervantes's bedroom and at some point was moved into the bedroom) and once on the couch in the bedroom. (5 RT 1262–66, 1268, 1278, 1287). Petitioner said something about doing these things to help his marriage, but the victim did not know what he meant. (5 RT 1254–55). When the victim was approximately eleven years old, she eventually told her sister about what Petitioner did to her because she thought Petitioner would not stop. (5 RT 1243, 1260, 1268).

On August 25, 2011, a nurse practitioner examined the victim, found no physical injuries or abnormalities on her body, determined that the victim had a normal hymen that had not been lacerated, cut, or bruised, and collected two breast swabs. (6 RT 1506–07, 1512–13, 1520–22). A small amount of male DNA was found on one of the breast swabs, and Petitioner was eliminated as a possible contributor to the male DNA. (5 RT 1308–10, 1313; 6 RT 1542–43, 1545, 1549). The DNA expert explained that DNA can transfer in numerous ways and that the third-party DNA could have ended up on victim as a result of innocent, non-criminal activity. (6 RT 1545–49, 1555–57).

Petitioner was interviewed by Sergeant Zachary Zamudio of the Madera County Sheriff's Department. (6 RT 1558–60). Sergeant Zamudio does not speak Spanish, Petitioner spoke Spanish during the interview, and they relied on an interpreter. (8 RT 2168). The interview was recorded, played to the jury, and introduced into evidence. (6 RT 1559–62; CT 130). Petitioner denied penetrating the victim with his fingers or penis, but admitted to touching and sucking the victim's breasts, putting his mouth on the victim's vagina, putting his fingers and penis on the victim's vagina, and having the victim touch his penis. (Supp. CT[4] 32–59). Petitioner told the

---

[4] "Supp. CT" refers to the 1st Supplemental Clerk's Transcript on Appeal, consisting of 68 pages, lodged by Respondent on March 9, 2018. (ECF No. 36).

victim that she was helping his marriage and stated in the interview that what they were doing excited him so he could make love to his wife. (Supp. CT 26, 52). Petitioner told Sergeant Zamudio that he lied at beginning of the interview because he was embarrassed and that he knew he would go to jail for his actions. (Supp. CT 60–61). Petitioner claimed to have asked the victim for forgiveness, to which the victim responded, "Yeah, okay." (Supp. CT 59–60). In dictating an apology letter for the victim, Petitioner stated that he was very sorry, felt very bad, and had to pay for what he did. (Supp. CT 62–63).

In Petitioner's defense, Carmen Cervantes testified that Petitioner and the victim would play a lot, "chasing each other, playing tag, playing video games," watching television and movies, and "horsing around." (10 RT 2715–16, 2726). Ms. Cervantes never saw Petitioner touch the victim inappropriately and did not believe that Petitioner had a "perverse sexual orientation towards young children" or a "proclivity to sexually assault children." (10 RT 2717, 2720, 2721, 2726). Ms. Cervantes testified that her opinion would change if she knew that Petitioner admitted to sexual acts with the victim. (10 RT 726–27).

The California Court of Appeal set forth the facts applicable to the <u>Marsden</u> claim as follows:

> **1. Appellant's first letter to the trial judge.**
> In May 2013, appellant handwrote a letter in Spanish to the trial judge. The letter was rewritten in English and was filed with the court on June 3, 2013, a little over two weeks before trial started. The English version of the letter, complete with numerous misspellings and grammatical mistakes, reads as follows:
>
> "To Judge Dale Blea
>
>> "Thank you for reading this letter. [A]nd light of the lack of information in my case I beg that you hear my petition, being that this will help you judge me with justly, for you to have [knowledge] of detective Zamudio short commings [*sic*].
>>
>> "And record can be established about him so he no longer lies, premeditatively.
>>
>> " 'The filed report is incomplete[.]'
>
> "A statement that wasn't recorded exist which I can demonstrate that did happen on 08/24/11 at approximately 5:00 p.m. [H]is phone record will show when he calls the interpreter and where I manifest the intervenie [*sic*] of another person, waiting for them to detain[ ] him for having com[m]itted a crime at Cesar Chavez School. [D]uring this part of my statement I proved the

4

motives of why the pseudo victim gave a statement against me. I also proved the negligence and lack of responsibility on behalf of the detective who deliberately withheld the key statement for my defense.

" 'I'm asking for a copy of the medical treatment' for [¶] Within the jail I have been receiving treatment for contagious venereal disease, but they have told me that I need a court order to obtain my medical record. [W]ith this copy I can demonstrate and prove that I never had any type of sexual contact ever with the victim.

"I do this personally because I consider that I have not received the necessary attention by my attorney and they haven't investigated what is necessary.

"I hope that it is possible that all information can be sent to the attorney in my case.

"Awaiting your comphrention [*sic*] and attention to this matter.

"Thank you."

On June 3, 2013, a court proceeding occurred before Judge Blea. Trial was confirmed for June 18, 2013. No reference was made to appellant's letter and no action was taken regarding the letter.

On June 17, 2013, the attorneys confirmed jury trial for the following day. No reference or action was taken regarding appellant's letter.

**2. Appellant's second letter to the trial judge.**
Following his convictions, appellant handwrote a letter in Spanish dated July 30, 2013. The letter was rewritten in English and typed. The trial court received the letter on or about August 7, 2013, almost two months before the sentencing hearing occurred. The letter reads as follows:

"Re: Application for Appeal

"We all know that the minor was found to be normal physically and that the DNA found in her belongs to a different person. Plus, the audio on my statement was shortened, fixed and incomplete. It was hiding the truth behind the motive and the date of when this problem started. The proof that was presented was solicited by the DA but the defense attorney presented was eliminated in my defense. This fabricated a case where I would lose and they conspired so that all my rights were trampled over. I don't know if you were ignoring this or if you had knowledge of it. I also do not know if I should consult:

"Sacramento court of appeals

"Amnesty International

"Human Rights

"None the less, I'd like to trust in your good judgment and rectitude. And now I ask you: Do I have the right to ask for an appeal and begin anew?"

### 3. Appellant's letter to the probation officer.

On or about August 20, 2013, appellant handwrote a letter in Spanish addressed to the probation officer. The letter was rewritten in English and typed. Both versions were attached to the September 5, 2013, probation report. The English version reads as follows:

"In the beginning of 2011 [the victim] was obligated to tattoo on her hand 'N 13' to be a member of a criminal street gang at Cesar Chavez Elementary School. After two to three months she came and asked my wife for help because regarding bleeding from her intimate parts. At that time we thought she was beginning menstruation. However, the following month she did not menstruate. Her attitude towards me continued and she continued to be involved in the criminal street gang. I began to think that someone had harmed her and I began to ask her. I looked for additional tattoos on her because in the past she told me that she was going to get another tattoo. She always told me it was none of my business. I continued trying to investigate to know for myself. I know I went about it the wrong way and in the process I made the mistake of touching her. I made it very clear and sincere that I never had any type of penetration or oral sex, or anything else that they accused me of. I hope that you take into consideration the way this [c]ase was orchestrated, altering and editing my declaration. Furthermore, they ignored the crime committed at the school involving her in order to distort the truth of the problem. I feel laughed at and discriminated against by District Attorney Sally Moreno and Sgt. Zackary Zamudio who are ... capable of walking all over my rights by finding a way to slander me and hide shamelessly the truth. I don't feel justice was served the deal in my case and the course they took with my case by influencing the jury to present a guilty verdict against me by eliminating the proof that my attorney provided in my defense such as: The girl is a virgin, [t]he DNA found on the girls [*sic*] breast did not belong to me but, someone else, the original charges were changed adopting the past results, the judge allowed jurors to disclose of the process on Facebook, my recorded declaration was heard shamelessly edited, hiding the dates and the motive of the problem, Sgt. Zamudio acted negligently as he did not investigate the other person involved that I mentioned, a witness in my defense was interviewed and declaration regarding the girls tattoo, nevertheless they decided not to touch the subject and present it to the jurors."

On October 3, 2013, the parties met in court for sentencing. The trial court indicated it had read and considered both the probation officer's report and appellant's letter. Later that day, as the court was about to pronounce sentence, appellant's defense counsel indicated that appellant wished to address the court. Appellant said the following:

"Okay. Despite the result, I continue to think that—that anybody—that any person must take responsibility for their errors. But ... definitely the result of this trial ... is indicative of abusive power and actions, corrupt actions on behalf of the District Attorney.

"All of us know that the minor, she's still a virgin, and that the DNA—that they were found that were—that was found on her breasts belonged to somebody else and that is not mine. And I shouldn't—we know that—we know that the District Attorney cut and edited my statement in order to cover up the date and the motive where this problem started. Now I failed—I feel discriminated again in front of—on behalf of the District Attorney, and they are making me pay for something that never happened.

> "I just ask that Your Honor pay attention to this and to learn how to do things at a later date in a better fashion and based on truth. That's all, your Honor."

After a short irrelevant exchange, the court asked appellant if he had anything else. The following exchange occurred:

> "[APPELLANT]: Well, I still have just the question, the motive, why this whole problem started, it is founded on—in a crime that was perpetrated at the Cesar Chavez school when the girl—they had the tattoo placed on her with the No. 13 and—and this instance, I have actually made a report of it in at least ten different spots, ten different places. I have sent letters for somebody to stop that criminal activity at that school, because I know that the influence of that criminal activity can affect how my son is raised. And, to date, I still don't know if that action is ... something just in passing in this community, or if, in reality, I'm just exaggerating. I just don't know.

> "THE COURT: All right. Thank you, sir."

The trial court noted that the issues involved at the school were not the subject of the sentencing hearing and proceeded to pronounce sentence.

Zapata, 2015 WL 6945730, at *1–3.

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Madera County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. The Court looks to the last reasoned state court decision as the basis for the state court judgment. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

///

///

///

9

# IV.

## DISCUSSION

### A.  Constructive Denial of Assistance of Counsel

In his first claim for relief, Petitioner asserts that the trial court erred by failing to undertake the requisite inquiry pursuant to <u>People v. Marsden</u>, 2 Cal. 3d 118 (Cal. 1970), regarding Petitioner's requests to substitute counsel, thereby denying Petitioner a fair trial and the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. (ECF No. 21 at 7).[5] Respondent argues that the state court's denial of Petitioner's <u>Marsden</u> claim is not cognizable and does not offend any United States Supreme Court precedent. (ECF No. 34 at 27).

The constructive denial of assistance of counsel claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 4, 5). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's <u>Marsden</u> claim, the California Court of Appeal stated:

**I. The Trial Court Was Not Required To Make An Inquiry Under *Marsden*.**
Appellant asserts that his individual complaints were sufficient to trigger the trial court's obligation to inquire into the competency of his appointed counsel and make inquiries under *Marsden,* resulting in error. He further argues that even if his individual complaints were not sufficient to trigger the court's duty, the context of his complaints must be examined in light of his low education, his need for an interpreter, and his lack of prior experience with the criminal justice system. He contends that a clear indication of his dissatisfaction with his appointed counsel is clear when everything is read together cumulatively. Finally, he asserts that the trial court's error resulted in an unfair trial and denied him the right to the effective assistance of counsel under the Sixth and Fourteenth Amendments. He argues that reversal is required. We disagree.

A criminal defendant is constitutionally entitled to the assistance of court-appointed counsel if unable to hire private counsel. (*Marsden, supra,* 2 Cal.3d at p. 123.) A defendant has the right to discharge appointed counsel and substitute another attorney, but that right is subject to the trial court's discretion. (*Ibid.*) When a defendant complains about the adequacy of appointed counsel, the trial court must permit the defendant to articulate the basis for his concerns so the court can determine if they have merit and, if necessary, appoint new counsel. (*Id.* at pp. 123–124.) The rule requiring a *Marsden* hearing also applies posttrial

---

[5] Page numbers refer to the ECF page numbers stamped at the top of the page.

because a defendant is entitled to competent representation at all times. (*People v. Smith* (1993) 6 Cal.4th 684, 691.) Substitute counsel should be appointed when the court determines the first appointed attorney is not providing adequate representation or there is an irreconcilable conflict so that ineffective representation will likely occur. (*People v. Sanchez* (2011) 53 Cal.4th 80, 88–89.)

The defendant must move in some manner to discharge the relationship. (*People v. Lucky* (1988) 45 Cal.3d 259, 281.) "The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing." (*Ibid.*) An indigent defendant does not have a constitutional right to an attorney conducting the defense according to the defendant's wishes, and a disagreement over trial tactics does not necessarily compel appointment of new counsel. (*Id.* at pp. 281–282.) A defendant is not required to file a formal motion to relieve appointed counsel. (*People v. Valdez* (2004) 32 Cal.4th 73, 97.) However, the defendant must provide some clear indication that new counsel is desired. (*Ibid.*) Without such a clear indication in the record, no error occurs when the trial court fails to conduct a *Marsden* hearing. (*People v. Richardson* (2009) 171 Cal.App.4th 479, 484.) A defendant must do more than grumble about his counsel's performance. (*People v. Lee* (2002) 95 Cal.App.4th 772, 780.)

In *People v. Dickey* (2005) 35 Cal.4th 884, the defendant stated he was not satisfied with the competency of his attorney, noting his counsel failed to call witnesses who were available and crucial to his defense, his counsel failed to raise crucial issues at trial, and his counsel failed to ask him certain questions while he was on the witness stand. (*Id.* at p. 919.) Our Supreme Court determined the defendant did not clearly indicate he wanted substitute counsel appointed for the penalty phase of his trial. (*Id.* at pp. 920–921.) Accordingly, *Dickey* concluded that the trial court did not err. (*Id.* at p. 920.)

Here, appellant's first letter indicated his strongest dissatisfaction with his counsel, noting he was not receiving the necessary attention and "they" had not investigated what appellant believed was necessary. However, similar to the defendant in *People v. Dickey, supra,* 35 Cal.4th 884, neither this letter, nor any of appellant's other communications, can be construed as an indication, must less a "clear" one, that he desired new counsel. Indeed, appellant's first letter asks the court to send any information it has to his current counsel. Appellant's dissatisfaction with his appointed counsel appears more like grumbling about performance (see *People v. Lee, supra,* 95 Cal.App.4th at p. 780), or a difference in opinion over trial tactics (*People v. Lucky, supra,* 45 Cal.3d at p. 281) than a desire to end the relationship. A majority of appellant's comments were complaints directed at the prosecution and law enforcement.

Via letter dated October 30, 2015, appellant cites this court's opinion in *People v. Velasco–Palacios* (2015) 235 Cal.App.4th 439 (*Velasco–Palacios*) as new authority in support of his arguments that a statement was not recorded, and his own statement was shortened, fixed, incomplete, cut and edited. This authority is unpersuasive.

In *Velasco–Palacios,* the prosecutor inserted a false confession into a transcript of the defendant's police interrogation. The defendant's motion to dismiss was granted on the basis of outrageous government misconduct. (*Velasco–Palacios, supra,* 235 Cal.App.4th at p. 442.) The court found that the misconduct " 'diluted the protections coming with the right to counsel' " and risked the defendant being fraudulently induced to enter a plea and forfeit his right to a jury trial. (*Id.* at p.

444.) On appeal, this court affirmed the trial court's order of dismissal because the defendant's constitutional right to counsel was prejudiced by the prosecutor's misconduct. (*Id.* at pp. 451–452.)

*Velasco–Palacios* did not involve a defendant's stated dissatisfaction with appointed defense counsel or a request to remove appointed counsel. *Velasco–Palacios* is inapposite to the present analysis and does not dictate reversal. When appellant's communications are read individually or collectively, this record does not establish his clear desire to discharge his appointed counsel. This is true even when appellant's low level of education, language skills and lack of contact with the criminal justice system are considered. The trial court was under no duty to conduct a *Marsden* hearing or make similar inquiries.[6] Appellant's convictions will not be reversed.

Zapata, 2015 WL 6945730, at *3–4 (footnote in original).

To the extent that Petitioner asserts a violation of Marsden, the Court finds such a claim is not cognizable in federal habeas corpus. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996) (citations omitted) ("We accept a state court's interpretation of state law, and alleged errors in the application of state law are not cognizable in federal habeas corpus.").

With respect to Petitioner's federal claims related to the conflict with defense counsel, the California Court of Appeal explicitly stated that it did not address Petitioner's "contention that he was denied a fair trial and the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments." Zapata, 2015 WL 6945730, at *4 n.2. As the state court did not reach the merits of Petitioner's federal claim, the Court will review the claim *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

"The Supreme Court has held that a defendant is constitutionally entitled to a lawyer who is free of conflicts of interest and who can act as a loyal advocate, but he has no constitutional right to a 'meaningful relationship' with appointed counsel." Plumlee v. Masto, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc). In Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc), the

---

[6] Because the trial court did not err, we do not address appellant's contention that he was denied a fair trial and the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments.

Ninth Circuit addressed a habeas petitioner's claim "that the state trial court violated his right to counsel by failing to rule on his pre-trial motion requesting substitute counsel." Id. at 1020. The Ninth Circuit found the state court's failure to properly address the petitioner's motion to be a "non-structural constitutional error." Id. at 1027. The Ninth Circuit framed the "ultimate constitutional question" presented in the case as follows:

> In this case, the issue is neither Schell's right to choice of counsel nor a denial of counsel. Instead, the basic question is simply whether the conflict between Schell and his attorney prevented effective assistance of counsel. See Morris, 461 U.S. at 13–14, 103 S.Ct. 1610 (holding that the Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between a defendant and counsel). It may be the case, for example, that because the conflict was of Schell's own making, or arose over decisions that are committed to the judgment of the attorney and not the client, in fact he actually received what the Sixth Amendment required in the case of an indigent defendant, notwithstanding the State trial court's failure to inquire.
>
> Thus, the ultimate constitutional question the federal courts must answer here is not whether the state trial court "abused its discretion" in not deciding Schell's motion, but whether this error actually violated Schell's constitutional rights in that the conflict between Schell and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment.

Schell, 218 F.3d at 1026 (footnote omitted).

Petitioner fails to demonstrate that the conflict between Petitioner and defense counsel was such that Petitioner was deprived of his right to assistance of counsel. To "show that there was an 'extensive, irreconcilable conflict' between [a petitioner] and his appointed counsel[, t]his conflict must have led to 'a significant breakdown in communication that substantially interfered with the attorney-client relationship.'" United States v. Mendez-Sanchez, 563 F.3d 935, 943 (9th Cir. 2009) (first quoting United States v. Smith, 282 F.3d 758, 763 (9th Cir. 2002); then quoting United States v. Adelzo-Gonzalez, 268 F.3d 772, 779 (9th Cir. 2001)). "A conflict that is based solely on 'disputes regarding trial tactics' generally is not the type of conflict that warrants substitution of counsel." United States v. Carter, 560 F.3d 1107, 1113 (9th Cir. 2009) (quoting United States v. McKenna, 327 F.3d 830, 844 (9th Cir. 2003)).

///

In his first letter to the trial court, Petitioner accused Sergeant Zamudio of lying and filing an incomplete report. Petitioner indicated that Sergeant Zamudio's "phone record" would show a statement made by Petitioner on August 24, 2011 at approximately 5:00 p.m. that was not included in the report. Petitioner also requested a copy of his medical records, which would show that Petitioner was receiving treatment for a contagious venereal disease and thus, prove that Petitioner never had any type of sexual contact with the victim. Zapata, 2015 WL 6945730, at *1. Petitioner informed the trial court of his reason for writing as follows: "I do this personally because I consider that I have not received the necessary attention by my attorney and they haven't investigated what is necessary. I hope that it is possible that all information can be sent to the attorney in my case." Id. at *2. Petitioner's subsequent letters focused extensively on his complaints of the prosecution and law enforcement rather than defense counsel.

In sum, Petitioner believed that his case was not receiving the necessary attention from defense counsel, who had not investigated what Petitioner deemed to be necessary. However, Petitioner does not demonstrate that any conflict between defense counsel and Petitioner resulted in "a significant breakdown in communication that substantially interfered with the attorney-client relationship." Adelzo-Gonzalez, 268 F.3d at 779. Accordingly, the Court finds that Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

**B. Restriction of Cross-Examination**

In his second claim for relief, Petitioner asserts that the trial court unfairly restricted the defense's cross-examination of the victim regarding her sexual history and the number 13 tattoo on her hand. (ECF No. 21 at 9, 50). Respondent argues that the state court's denial of this claim was on the merits, is entitled to AEDPA deference, and does not offend any United States Supreme Court precedent. (ECF No. 34 at 25–27, 32).

1. Standard of Review

This claim was raised in all of Petitioner's state habeas petitions. In denying Petitioner's state habeas petition, the California Supreme Court stated: "The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474 [a petition for writ of habeas corpus must include copies of reasonably available documentary evidence].)" (LD 17).

Respondent contends that the California Supreme Court's <u>Duvall</u> citation did not apply to the restricted cross-examination claim because said claim is based on the appellate record. Respondent further argues that even if the <u>Duvall</u> citation applied to this claim, the California Supreme Court's denial was a merits adjudication. (ECF No. 34 at 25–27). "Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review . . . ." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 390 (2010). Accordingly, the Court will proceed to review Petitioner's claim *de novo*.

   2.   <u>Analysis</u>

   The Sixth Amendment's Confrontation Clause, made applicable to the states by the Fourteenth Amendment, <u>Pointer v. Texas</u>, 380 U.S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" <u>Davis v. Alaska</u>, 415 U.S. 308, 315 (1974) (quoting 5 J. Wigmore, <u>Evidence</u> § 1395, at 123 (3d ed. 1940)). However, the Supreme Court has recognized that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) (per curiam).

      **a.  Tattoo**

   Petitioner argues that the trial court erroneously prevented defense counsel from cross-examining the victim regarding a number 13 tattoo, which Petitioner alleges was "placed on her hand, that she made at the urging of a male classmate to be a member of a criminal street gang[.]" (ECF No. 21 at 50). The issue of the victim's tattoo was raised at the motion *in limine* hearing. (1 RT 17). Defense counsel informed the trial court that the victim "had this tattoo,

came home with it, Mr. Zapata confronted her with it and . . . there was a family debate issue regarding that tattoo. Just after that, the allegations were made that my client did some inappropriate things. So that could be a possibility as to why she's saying these things." (1 RT 17–18). The trial court indicated that if the evidence of the tattoo was otherwise admissible, it might be presented as to the victim's credibility because it "[s]eems that if the defense has a reasonable motivation why the child would implicate Mr. Zapata that that is relevant." (1 RT 19).

Immediately prior to the commencement of the subsequent 402 hearing,[7] defense counsel informed the trial court that he no longer believed the tattoo issue is "as big an issue as [he] had thought" after speaking with Ms. Cervantes, the victim's sister. (4 RT 906). At the 402 hearing, Ms. Cervantes testified that the victim had returned home with a marking of the number 13 on her hand. The marking was not a tattoo, but rather was made by the victim "getting a pen and just writing really hard on her hand." (4 RT 923). The victim told Ms. Cervantes that a boy from her class had told her and some other girls to do it, and explained that her favorite singer also likes the number 13. (4 RT 923). Ms. Cervantes testified, "I know I had gotten onto her . . . . She wrote it so hard that it cut into her skin." (4 RT 923). Petitioner did not discipline the victim, but "told her that she shouldn't be doing that." (9 RT 924). After hearing Ms. Cervantes's testimony, defense counsel informed the court that the tattoo issue was "probably less relevant" and that he was not going to offer the tattoo evidence as he did not "believe that's going to be important to the case." (9 RT 947).

Here, defense counsel indicated to the trial court that the tattoo evidence was not as important as he initially believed and that counsel would not seek to introduce such evidence. The trial court did not prevent or otherwise restrict defense counsel from cross-examining the victim regarding the alleged tattoo. Thus, there was no Confrontation Clause violation with respect to the tattoo evidence, and Petitioner is not entitled to habeas relief on this ground. To the extent Petitioner asserts ineffective assistance of counsel for failing to question Ms. Cervantes at trial regarding the tattoo, the Court will address Petitioner's claim in section IV(E)(2), *infra*.

---

[7] California Evidence Code section 402(b) provides that the "court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury[.]" Cal. Evid. Code § 402(b).

### b.  Victim's Sexual History

With respect to questions regarding the victim's past or present sexual history or activities with anyone other than Petitioner, the trial court granted the prosecution's motion *in limine*. (1 RT 20; CT 108). At the motion *in limine* hearing, defense counsel stated that he intended to ask the DNA expert and the victim about the male DNA, which came back negative for Petitioner, but that the questions would not be sexual in nature. (1 RT 12–13). The trial court indicated that if evidence from the 402 hearing or trial established that it was possible another person supplied the DNA in an inappropriate manner, then the issue could be addressed further at that time. (1 RT 16–17, 20). Subsequently during the trial, the court stated that the victim would be subject to recall with respect to the third-party DNA if it appeared necessary after the DNA expert's testimony. (5 RT 1212). Although defense counsel initially planned to recall the victim for further testimony, counsel subsequently informed the court that for "strategic reasons" he was no longer going to do so. (8 RT 2115; 9 RT 2428).

Petitioner has failed to show any harm in the trial court's limitation related to cross-examining the victim regarding her past or present sexual history or activities with anyone other than Petitioner. Defense counsel was able to cross-examine the victim extensively regarding the incidents with Petitioner. There was evidence introduced at trial that Petitioner was eliminated as a contributor to the male DNA found on the victim's breast, the nurse practitioner found no physical injuries or abnormalities on the victim's body, and the victim's hymen was normal with no lacerations, cuts, or bruises. (6 RT 1520–22, 1545, 1549). Petitioner has not established that the inability to cross-examine the victim regarding her sexual history or activities with anyone other than Petitioner "had substantial and injurious effect or influence" on the verdict. Brecht, 507 U.S. at 637. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### C.  Admission of Confession

In his third claim for relief, Petitioner asserts that his conviction was based on an unlawful confession. (ECF No. 21 at 10, 54). Respondent argues that the state court's denial of this claim was on the merits, is entitled to AEDPA deference, and does not offend any United States Supreme Court precedent. (ECF No. 34 at 25–27, 35). For the reasons set forth in section

IV(B)(1), *supra*, the Court will review Petitioner's claim *de novo*. <u>See</u> <u>Thompkins</u>, 560 U.S. at 390.

      1.  <u>Factual Background</u>

Petitioner was interviewed by Sergeant Zachary Zamudio of the Madera County Sheriff's Department. (6 RT 1558–60). The interview was recorded. (6 RT 1560–61). After first asking Petitioner if he knew why he was being interviewed, Petitioner's address, date of birth, and age, Sergeant Zamudio had a department certified translator read Petitioner his <u>Miranda</u> rights. (Supp. CT 5–6; 6 RT 1560). Petitioner indicated that he understood his rights. (Supp. CT 6). During the interview, Petitioner denied penetrating the victim with his fingers or penis, but admitted to touching and sucking the victim's breasts, putting his mouth on the victim's vagina, putting his fingers and penis on the victim's vagina, and having the victim touch his penis. (Supp. CT 32–59). Petitioner told the victim that she was helping his marriage and stated in the interview that what they were doing excited him so he could make love to his wife. (Supp. CT 26, 52). At the end of the interview, Sergeant Zamudio asked Petitioner where he was born. (Supp. CT 64–65).

Defense counsel did not move to suppress Petitioner's statements, but rather moved *in limine* to allow the entire conversation to be admitted and to introduce all relevant evidence necessary to make Petitioner's alleged admissions fully understood. (1 CT 103–05; 1 RT 24–26). At the motion *in limine* hearing, the prosecutor stated that she intended to introduce the entire conversation, and the trial court indicated that the admission of any additional evidence to explain Petitioner's alleged admissions would be addressed on a case-by-case basis. (1 RT 25–26). Prior to Petitioner's interview being introduced into evidence and played for the jury, references to an arrest in Mexico, which were made at the beginning of the interview, and references to a polygraph test, which were made partway through the interview, were removed with the apparent agreement of the parties and the trial court. (5 Aug. RT[8] 1354–55; 4 RT 967–68, 971). The record before this Court does not include the unredacted interview transcript or recording.

_____

[8] "Aug. RT" refers to the Reporter's Augmented Transcript on Appeal lodged by Respondent on March 9, 2018. (ECF No. 36).

1    2.  <u>Legal Standard</u>

2    Before a suspect can be subjected to custodial interrogation, he must be warned "that he

3    has the right to remain silent, that anything he says can be used against him in a court of law, that

4    he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be

5    appointed for him prior to any questioning if he so desires." <u>Miranda v. Arizona</u>, 384 U.S. 436,

6    479 (1966). "After such warnings have been given, and [an] opportunity [to exercise these rights]

7    afforded him, the individual may knowingly and intelligently waive these rights and agree to

8    answer questions or make a statement." <u>Id.</u> With respect to waiver of <u>Miranda</u> rights, "[t]he

9    inquiry has two distinct dimensions":

10           First, the relinquishment of the right must have been voluntary in
             the sense that it was the product of a free and deliberate choice
11           rather than intimidation, coercion, or deception. Second, the waiver
             must have been made with a full awareness of both the nature of
12           the right being abandoned and the consequences of the decision to
             abandon it. Only if the "totality of the circumstances surrounding
13           the interrogation" reveal both an uncoerced choice and the
             requisite level of comprehension may a court properly conclude
14           that the <u>Miranda</u> rights have been waived.

15    <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (citations omitted). "[U]nless and until such

16    warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a

17    result of interrogation can be used against" the suspect. <u>Miranda</u>, 384 U.S. at 479. However,

18    "[t]he requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the

19    voluntariness inquiry." <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000).

20    The Due Process Clause of the Fourteenth Amendment requires confessions to be

21    voluntary in order to be admitted into evidence. <u>Dickerson</u>, 530 U.S. at 433. The due process

22    voluntariness test "examines 'whether a defendant's will was overborne' by the circumstances

23    surrounding the giving of a confession" and "takes into consideration 'the totality of all the

24    surrounding circumstances—both the characteristics of the accused and the details of the

25    interrogation.'" <u>Id.</u> at 434 (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)). In

26    sum, the voluntariness "determination 'depend[s] upon a weighing of the circumstances of

27    pressure against the power of resistance of the person confessing.'" <u>Dickerson</u>, 530 U.S. at 434

28    (quoting <u>Stein v. New York</u>, 346 U.S. 156, 185 (1953)).

### 3. Analysis

In the traverse, Petitioner asserts that prior to receiving the <u>Miranda</u> advisement, Petitioner made statements to Sergeant Zamudio regarding his immigration status and an arrest in Mexico for failing to pay child support. (ECF No. 38 at 26). To the extent that <u>Miranda</u> applies to the biographical questions posed to Petitioner at the beginning of the interview before Petitioner received the <u>Miranda</u> advisement,[9] Petitioner is not entitled to habeas relief on this ground because Petitioner's unwarned statements regarding his immigration status and arrest in Mexico were not admitted at trial. (4 RT 967–71). <u>See</u> <u>Jones v. Harrington</u>, 829 F.3d 1128, 1141 (9th Cir. 2016) ("<u>Miranda</u> error does not entitle [a petitioner] to habeas relief if the error was harmless.").

Petitioner also contends that his admissions were coerced under the threat of a polygraph test and deportation. (ECF No. 21 at 55–58; ECF No. 38 at 26). "[I]t is the petitioner's burden to prove his custody is in violation of the Constitution, laws or treaties of the United States. This burden of proof must be carried by a preponderance of the evidence." <u>Silva v. Woodford</u>, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted). <u>See also</u> <u>Ben-Sholom v. Ayers</u>, 674 F.3d 1095, 1099 (9th Cir. 2012). Here, the state court record does not establish, and Petitioner has not provided the Court with sufficient factual allegations to demonstrate, that the totality of the circumstances supports the conclusion that Petitioner's statements were coerced or involuntary.

Although it is clear from the record that there were references made to a polygraph test during the interview, the record before this Court does not include the unredacted interview transcript or recording. Defense counsel described the reference to a polygraph test as follows: "There was part way through the transcript it was either suggestion by my client or officer or Officer Zamudio about taking a lie detector test, which my client said 'uh-huh' in the affirmative. Of course, no lie detector was conducted and it's not relevant in court." (5 Aug. RT 1354). In the second amended petition, Petitioner merely states in conclusory fashion, without

---

[9] "[T]he term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).

any supporting factual allegations, that his confession was coerced by Sergeant Zamudio's comment that Petitioner take a polygraph test. (ECF No. 21 at 58, 59). However, "[t]he prospect of a voluntary polygraph examination is not coercive." United States v. Eagle, 293 F. App'x 506, 508 (9th Cir. 2008) (citing United States v. Haswood, 350 F.3d 1024, 1028–29 (9th Cir. 2003)).

Petitioner appears to assert that his answer to the biographical questions posed to him prior to receiving the Miranda advisement regarding his immigration status and prior arrest in Mexico led Petitioner to be afraid of being deported. (ECF No. 21 at 55, 58). The record before this Court does not include the unredacted interview transcript or video, and thus, does not establish what Sergeant Zamudio said regarding Petitioner's immigration status and prior arrest in Mexico. However, Sergeant Zamudio's question regarding where Petitioner was born at the end of the interview was not "the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." Burbine, 475 U.S. at 433–34.

Based on the foregoing, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

**D.  Sufficiency of the Evidence**

In his fourth claim for relief, Petitioner asserts, *inter alia*, that there was insufficient evidence to support his convictions on counts 1 and 3.[10] (ECF No. 21 at 12, 60–63). Respondent argues that the state court's denial of this claim was on the merits, is entitled to AEDPA deference, and does not offend any United States Supreme Court precedent. (ECF No. 34 at 25–27, 38). For the reasons set forth in section IV(B)(1), *supra*, the Court will proceed to review Petitioner's claim *de novo*. See Thompkins, 560 U.S. at 390.

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A

---

[10] In his fourth claim for relief, Petitioner also asserts ineffective assistance of counsel, which is discussed in section IV(E), *infra*.

reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman v. Johnson, 566 U.S. 650, 655 (2012) (quoting Jackson, 443 U.S. at 319). Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 556 U.S. 1, 2 (2011).

Viewing the record in the light most favorable to the prosecution and presuming the jury resolved any conflicting inferences in favor of the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that Petitioner committed digital penetration of a child ten years or younger (count 1) and engaged in oral copulation with a child ten years or younger (count 3). The victim testified that Petitioner touched her breast and vagina, put his finger inside her vagina, attempted to have sexual intercourse with her, rubbed his penis against her thigh and vagina, licked her vagina, and put her hand on his penis. (5 RT 1232–46, 1251, 1257–59, 1286). Petitioner appears to argue that the victim's testimony was false because (1) the nurse practitioner found no injuries on the victim and determined that she had a normal hymen, and (2) Petitioner was eliminated as a contributor to the male DNA found on the victim's breast. (ECF No. 21 at 61–62). This evidence was presented to the jury along with Petitioner's interview in which he denied penetrating the victim with his fingers or penis, but admitted to touching and sucking the victim's breasts, putting his mouth on the victim's vagina, putting his fingers and penis on the victim's vagina, and having the victim touch his penis. (Supp. CT 32–59).

In light of the verdict, the jury clearly found the victim and her testimony to be credible, and "under Jackson, the assessment of credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). See also Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are therefore entitled to near-total

1  deference under Jackson."). Accordingly, Petitioner is not entitled to habeas relief on this

2  ground.

3  **E.  Ineffective Assistance of Counsel**

4  In his fourth claim for relief, Petitioner also asserts that trial counsel was ineffective for

5  not properly examining Carmen Cervantes and for failing to file a motion to suppress Petitioner's

6  confession. (ECF No. 21 at 12, 63–65). Further, Petitioner contends that his appellate counsel

7  was ineffective for failing to raise the claims set forth in the instant habeas petition on direct

8  appeal. (Id. at 66). Respondent argues that the state court's denial of the ineffective assistance of

9  counsel claims was on the merits, is entitled to AEDPA deference, and does not offend any

10 United States Supreme Court precedent. (ECF No. 34 at 25–27, 41, 44). For the reasons set forth

11 in section IV(B)(1), *supra*, the Court will proceed to review Petitioner's claim *de novo*. See

12 Thompkins, 560 U.S. at 390.

13 1.  Strickland Legal Standard

14 The clearly established federal law governing ineffective assistance of counsel claims is

15 Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1)

16 "counsel's performance was deficient," and (2) "the deficient performance prejudiced the

17 defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that

18 "counsel's representation fell below an objective standard of reasonableness" and "that counsel

19 made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

20 defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance

21 is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within

22 the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a

23 petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional

24 errors, the result of the proceeding would have been different. A reasonable probability is a

25 probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether

26 it is 'reasonable likely' the result would have been different. . . . The likelihood of a different

27 result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland,

28 466 U.S. at 696, 693).

2.  <u>Failure to Properly Examine Carmen Cervantes</u>

Petitioner asserts that trial counsel was ineffective for not properly examining the victim's sister, Carmen Cervantes. Petitioner contends that Ms. Cervantes had knowledge and could explain to the jury the victim's motive for making false allegations against Petitioner. (ECF No. 21 at 64). According to Petitioner, the number 13 tattoo was "made at the urging of [a] male classmate to be a member of a criminal street gang," and Petitioner had requested the trial court to conduct a full investigation of the criminal activity at the victim's school. (ECF No. 21 at 50, 64). In his pre-sentencing letter to the probation officer, Petitioner explained:

> In the beginning of 2011 [the victim] was obligated to tattoo on her hand 'N 13' to be a member of a criminal street gang at Cesar Chavez Elementary School. . . . Her attitude towards me continued and she continued to be involved in the criminal street gang. I began to think that someone had harmed her and I began to ask her. I looked for additional tattoos on her because in the past she told me that she was going to get another tattoo. She always told me it was none of my business. I continued trying to investigate to know for myself. I know I went about it the wrong way and in the process I made the mistake of touching her. I made it very clear and sincere that I never had any type of penetration or oral sex, or anything else that they accused me of.

<u>Zapata</u>, 2015 WL 6945730, at *2.

At the 402 hearing, Ms. Cervantes testified that the victim had returned home with a marking of the number 13 on her hand. The marking was not a tattoo, but rather was made by the victim "getting a pen and just writing really hard on her hand." (4 RT 923). The victim told Ms. Cervantes that a boy from her class had told her and some other girls to do it and explained that her favorite singer also likes the number 13. (4 RT 923). Ms. Cervantes testified that Petitioner did not discipline the victim, but "told her that she shouldn't be doing that." (9 RT 924).

Based on Ms. Cervantes's testimony at the 402 hearing, the number 13 on the victim's hand was a marking made with pen, not a tattoo, and did not have a connection to a criminal street gang. Petitioner merely told the victim "that she shouldn't be doing that" and did not discipline her. Given that Ms. Cervantes's testimony would not have supported Petitioner's theory of the victim's alleged motive to lie, Petitioner has not established that there is "a reasonable probability that . . . the result of the proceeding would have been different" had

defense counsel questioned Ms. Cervantes at trial about the number 13 marking. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 3. Failure to File Suppression Motion

Petitioner asserts that trial counsel was ineffective for failing to file a motion to suppress Petitioner's confession. (ECF No. 21 at 64). "Generally, a defendant claiming ineffective assistance of counsel for failure to file a particular motion must not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability that the granting of the motion would have resulted in a more favorable outcome in the entire case." Styers v. Schriro, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008). As set forth in section IV(C), *supra*, the totality of the circumstances supports the conclusion that Petitioner's confession was voluntary. Therefore, Petitioner has not established that there is "a reasonable probability that . . . the result of the proceeding would have been different" had defense counsel filed a motion to suppress Petitioner's confession. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 4. Ineffective Assistance of Appellate Counsel

Petitioner asserts that appellate counsel was ineffective for failing to raise the claims presented in the instant federal habeas petition on direct appeal. (ECF No. 21 at 66). The Supreme Court has held that appellate counsel does not have a constitutional obligation to raise every nonfrivolous issue on appeal. Jones v. Barnes, 463 U.S. 745, 754 (1983). Rather, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751–52). As discussed in sections IV(B)–(D), *supra*, this Court has found, applying *de novo* review, that Petitioner is not entitled to habeas relief for the other claims he raises in the instant federal habeas petition. Therefore, Petitioner has not established that there is "a reasonable probability that . . . the result of the proceeding would have been different" had appellate counsel raised these claims on direct appeal. Strickland, 466 U.S. at 694. Accordingly, Petitioner is not entitled to habeas relief on this ground.

///

## V.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the second amended petition for writ of habeas corpus (ECF No. 21) be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 30, 2018**                    /s/ _Erica P. Grosjean_

UNITED STATES MAGISTRATE JUDGE